# THIRD DEPARTMENT, MARCH, 1967

## (March 1, 1967)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. LOUIS HENRY BURNS, Appellant.— *Per Curiam.* The defendant appeals from a judgment of the County Court of Sullivan County which convicted him, after a trial, of murder in the second degree. The principal issue is the voluntariness of defendant's confession; and we consider first and in some detail the police version thereof, which follows, inasmuch as the Trial Judge and the jury apparently accepted it as substantially true. Doris Anderson, with whom defendant lived, was fatally shot between the eyes, on or about April 27, 1965. The fact of her death was not known and her body was not immediately found and on May 9, 1965, defendant was questioned as to her disappearance by officer Scherpf, a State Police investigator, at the Monticello Police Station. According to Scherpf, defendant was asked some questions concerning the disappearance

and denied any knowledge as to Doris' whereabouts. Defendant had appeared at the station house voluntarily and left after the several questions were put to him. On May 10, 1965, between 4:00 and 5:00 P.M., Scherpf went to the Club Paradise outside Monticello, accompanied by officer Buck, and finding defendant there asked him to accompany them to the Ferndale State Police Station and defendant agreed to go. He was not then placed under arrest. Officer Kaljian questioned defendant from about 6:00 P.M. to 9:00 P.M. and during this time defendant was given some food. Thereafter Scherpf questioned defendant, starting around 10:45 P.M., and ending around 2:00 A.M. on the next day, May 11. Defendant told of his activities on the 27th of April and said that on the morning of April 28 he left the house with Doris asleep on the couch and that he had not seen her since. Subsequently Scherpf left the interrogation room, being relieved by Buck. Buck summoned Scherpf back at about 4:30 A.M. Both investigators were then joined by Lt. Yank of the Monticello police. At this point Scherpf informed defendant he was entitled to counsel, to which defendant replied, "I don't need an attorney, I want to get this off my chest and I have been upset over it the past few days and I just haven't been right." Thereupon defendant stated that he accidentally shot Doris when the gun went off in a scuffle between them; said that this occurred on April 27 in the evening during a heated quarrel which had its origins at the Club Paradise; that before grabbing the .22 calibre rifle Doris had tried to hit him with a whiskey bottle; and that when he jerked the gun away from Doris in her bedroom it discharged once, the bullet entering her forehead. After contemplating his course of action, defendant stuffed the body into a broom closet; cleaned up the rifle and disposed of the empty cartridge; took deceased's dog in deceased's car and left it in the lobby of the Gilbert Hotel in Fallsburg; he went to his job as caddy at the Concord Golf Course (it was then 7:00 A.M.) and along the way burned bloody linens and towels which he had taken from the house. After work on the 28th, defendant returned to deceased's house, placed her body in her car, and finally buried it in a shallow grave off Old Bailey Road. Scherpf testified that appellant was formally placed under arrest at 4:30 A.M. and was requested to take the officers to the burial site. He complied and upon leaving the station was handcuffed for the first time. After disclosing the burial site, defendant was taken to deceased's house where he re-enacted the event as he previously had described it. Upon the return to the State Police barracks, defendant's statement was reduced to writing by a question and answer process, being typed as it progressed. This started about 9:00 A.M., May 11, at which time defendant had some pastry and coffee. Again defendant was advised of his right to counsel, but rejected it. By 10:30 or 11:00 A.M., the typing had been finished and the seven-page statement was complete and signed. By the time the questioning had progressed to the sixth page, however, defendant was challenged as to the truthfulness of his account of the struggle, whereupon he changed his story. In the written statement defendant says he made a mistake; that during the struggle the gun went off, the bullet hitting the wall; that he then said, "Bitch, why do you want to shoot me, I didn't do anything to you"; whereupon, then being possessed of the gun, he put another bullet into the chamber, and discharged the gun as he turned around to face Doris, the bullet striking her between the eyes. Although the statement was taken and completed around 11:00 A.M., defendant was not arraigned until around 2:30 P.M. There appears to be no explanation for this hiatus. Scherpf testified that neither he nor any other officer that he knew of made any threats or promises to defendant. He said that he noticed no fatigue insofar as defendant was concerned (although he may have been a bit drowsy at times) and that defendant ate when the interrogators ate. Buck, testifying as to his period alone with defendant, said that it began

about 2:30 A.M. and lasted for about two hours. Defendant told the same story he had told the day before (May 9) about not knowing how Doris disappeared, but upon being told that he was lying, defendant said, "OK, call your partner, I'll tell you where she is." At this point Scherpf was called back and defendant made his first statement (the "one shot" or accident statement). Buck said that defendant never indicated that he wanted a lawyer. The rest of Buck's testimony conforms generally to Scherpf's. Lt. Yank testified that he first questioned defendant on May 8 in the street, and that at that time defendant denied knowledge of Doris Anderson's disappearance. Lt. Yank said that on the evening of May 10 when defendant was taken to the State Police barracks he agreed to take a polygraph test after it was explained that he was free not to take it and could walk out of the room. This apparently was done in the early evening and fills the hiatus until 10:45 P.M. when Scherpf took over. Kaljian supervised the polygraph test. Yank also said that defendant partook of sandwiches and coffee in the early morning. According to Yank, defendant was sobbing at 4:30 A.M. when he finally came out with his "one shot" statement. The rest of Yank's testimony conforms generally to Scherpf's and Buck's. Contesting the voluntariness of the confession, defendant testified at the *Huntley* hearing only. He said that he told Scherpf, when the latter approached him on May 10 at the Club Paradise, that he had an appointment with Louis Tieger, a lawyer, and felt that he should be advised by him before accompanying Scherpf. It could well be, and doubtless was found that this claim was dissipated by the testimony of Mr. Tieger's secretary. Defendant testified to nothing to account for the first two and one-half hours at the police barracks or until about 8:00 P.M. when he was questioned by Kaljian, apparently during the polygraph procedures. At about 10:00 P.M. he was taken downstairs where nothing significant seems to have occurred until Scherpf began to question him, after returning him to an upstairs room at about 11:00 P.M. He said that he was then exhausted. Continuing, he said that Scherpf then left and Buck took over the questioning, in the course of which he threatened him with his revolver and otherwise, and finally recalled Scherpf, at which time, defendant asserts, he asked for and was denied counsel. Continuing, defendant did not recount his version of an accidental shooting but did tell of the visits to the burial site and to Doris' apartment and of the return to the barracks and the recording of the questions and answers. The transcription of these he disputed in some respects, without, however, stating — or being asked — whether the statements contained the truth. He conceded that no physical force had been exerted upon him. At the conclusion of the *Huntley* hearing the court found, *inter alia,* that between 6:00 P.M. on May 10 and 4:30 A.M. on May 11 defendant consented to interrogation and to the polygraph test; that he was placed under arrest at 4:30 A.M.; and that he waived his right to counsel. As conclusions, the court found that defendant's constitutional right to counsel had not been violated; that his inculpatory statements, both oral and written, were voluntary ones and that the circumstances relating to and preceding the arraignment did not constitute unnecessary delay which rendered the statements involuntary. The court adequately and fairly charged the jury on the issue of voluntariness, including the provisions and the effect of section 165 of the Code of Criminal Procedure respecting arraignment without unnecessary delay. Upon this record, the Trial Judge's determination upon the *Huntley* hearing with respect to the confession cannot be disturbed; and the issue was thereafter properly and correctly submitted to the jury, whose finding was warranted. At the outset, the fact of the lapse of approximately 21 to 22 hours between the time that Scherpf and defendant met at the Club Paradise and defendant's eventual arraignment, demanded and received at our hands the minute examination and analysis that we have attempted to give it. Defend-

ant's assertions of threats and other forms of coercion, including deprivation of food, were properly submitted as factual issues and were resolved against him upon sufficient evidence. The question of prompt arraignment as bearing upon voluntariness was also properly submitted and determined. In this connection it will be recalled that the police did not, so far as appears, have any basis whatsoever for considering that Doris Anderson was dead, or even that her disappearance was the result of any criminal or other act on the part of the defendant or of anyone else, until 4:30 A.M., when defendant first gave his version of a purely accidental death; and it must be noted that defendant did not inculpate himself in an intended homicide until long after the typing of the question and answer statement had begun at 9:00 A.M. The statement was completed at 11:00 A.M. and there is no indication that the unexplained time interval ending with the arraignment at 2:30 P.M. affected the previously completed statement. It would not have to be found that the investigation was no longer a "general inquiry" and had "begun to focus" on defendant (*Escobedo* v. *Illinois*, 378 U. S. 478, 490–491) prior to the first information as to Doris' allegedly accidental death, elicited at 4:30 A.M.; and neither the critical period extending from that time to the completion of the statement at 11:00 A.M. or to the arraignment at 2:30 P.M., nor, indeed, the aggregate of the periods of defendant's interrogation, can be found, as a matter of law, so extreme as to be coercive (cf. *People* v. *Leonti*, 18 N Y 2d 384; involving a detention of 19 hours and other evidence far stronger against the inculpatory statements than the proof in the case before us). Defendant did not testify upon the trial and hence his claim, advanced upon the *Huntley* hearing, of denial of his right to counsel was not before the jury; and the issue was properly resolved against him by the Trial Judge's findings on the Huntley hearing (*People* v. *Gunner*, 15 N Y 2d 226, 232; *People* v. *Holmes*, 24 A D 2d 908); and *Miranda* v. *Arizona* (384 U. S. 436), subsequently decided, is, of course, inapplicable (*People* v. *McQueen*, 18 N Y 2d 337; *Johnson* v. *New Jersey*, 384 U. S. 719). As to weight of evidence — defendant's attempted impeachment of the proof that two shots were fired from the rifle that killed the deceased was thoroughly discredited, or so it could be found, by rebuttal evidence that the shot upon which defendant's theory rests was fired into a different wall from that where the .22 calibre rifle bullet fragment was found and, further, was fired from a shotgun. The remaining proofs, including direct and circumstantial evidence, as well as the proof of a prior altercation and threat to kill and of defendant's attempts at concealment of the body and the other evidences of crime, lend massive support to the verdict. The attempted impeachment of Lt. Yank by references to a magazine article for which he was said to have supplied factual data, failed when the People's objections were properly sustained, counsel's interrogation respecting this hearsay material proceeding in reverse of the correct method of laying a foundation for impeaching by prior contradictory statements. (Richardson, Evidence [9th ed.], § 514.) We find no merit in appellant's complaints as to the charge and no basis for the additional instructions now said to have been erroneously omitted. Appellant's remaining points are insubstantial and none are such as to require discussion. Judgment affirmed. Gibson, P. J., Herlihy, Reynolds and Staley, Jr., JJ., concur in memorandum *Per Curiam*; Aulisi, J., dissents and votes to reverse and grant a new trial, in the following memorandum. Aulisi, J. (dissenting): I cannot agree with the majority and vote to reverse and grant a new trial. When the record is viewed as a whole, there appears to be a violation of fundamental fairness in this case which in the interests of justice calls for a new trial. Of the many allegations of error advanced by defendant, the one attacking the trial court's holding that certain oral admissions and a written statement were voluntary — after a *Huntley* hearing which for various

reasons lasted four months — is the principal issue. Whether a confession is obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances and the court must inquire if the confession was obtained under a totality of circumstances evidencing an involuntary admission of guilt (see *Haynes* v. *Washington,* 373 U. S. 503). While it is true that prolonged detention in and of itself may not be enough to brand a confession involuntary, it is, however, a circumstance which must be considered together with any other if the delay is for no apparent reason other than that the police needed the confession (see *People* v. *Elmore,* 277 N. Y. 397; *People* v. *Spano,* 4 N Y 2d 256). In *Blackburn* v. *State of Alabama* (361 U. S. 199, 206) the Supreme Court stressed that the modern practice of in-custody interrogation is psychologically rather than physically oriented. "Since *Chambers* v. *Florida,* 309 U. S. 277, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." Although this case is not governed by *Miranda* v. *Arizona* (384 U. S. 436) because *Miranda* is not retroactive (*People* v. *McQueen,* 18 N Y 2d 337) waiver and its proof existed before *Miranda,* and the court in that case said at page 476: "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege." The defendant need not have been advised of his right to counsel before arraignment (*People* v. *Gunner,* 15 N Y 2d 226) and, of course, right to counsel can be waived (*People* v. *Bodie,* 16 N Y 2d 275). But if, after investigation focused upon him as a suspect, the defendant's request for counsel is denied, then his inculpatory statements are inadmissible (*Escobedo* v. *Illinois,* 378 U. S. 478; *People* v. *Donovan,* 13 N Y 2d 148). According to the police testimony here, Burns was first advised of his right to counsel about 4:30 A.M., May 11, although he had been a suspect at least since 10:00 P.M., May 10, when the lie-detector test was over. We must keep in mind that he had been questioned, although briefly, on May 8 and May 9. While under the *Gunner* rule (*supra*) failure to advise does not invalidate the confession, it may be considered a factor going to the voluntariness where there is prolonged detention. In *Davis* v. *North Carolina* (384 U. S. 737, 740–741) the court noted that although the legal effect of *Miranda* (*supra*) could not retroactively be applied, the failure fully to advise of the right to counsel at the outset of interrogation "is a significant factor in considering the voluntariness of statements later made. * * * Thus, the fact Davis was never effectively advised of his rights gives added weight to the other circumstances described below which made his confessions involuntary." In the light of the above well-established principles, it is my opinion that the voluntariness of defendant's statement was not proven beyond a reasonable doubt where, as here, the defendant had had no sleep and very little food for nearly 30 hours prior to the signing of the statement; had been in the hands of the police for 18½ hours and subjected to almost constant interrogation by a team of trained police investigators; had been subjected to a lie-detector test; was taken to the burial spot; was taken to the residence of the decedent in Monticello where the crime was committed; and then was returned to the State Police barracks where further interrogation took place. There is a noticeable failure of recollection by the prosecution witnesses concerning some happenings prior to the defendant's arraignment. They (Scherpf and Yank) do not deny that defendant asked for a lawyer

nor is there a denial that the District Attorney said to defendant " There are some statements in that statement that you signed that are not true and I'm going to give you five minutes to change them or else I'm not going to do anything for you, I can't help you and I'm not going to play with you any longer ". Neither is there a refutation that access to Burns was denied his wife and father-in-law. There is no explanation for the delay in arraignment. Defendant was placed under formal arrest at 4:30 A.M., May 11. Although the police took him to Monticello at about 8:30 A.M., four hours after his arrest, he was returned to the barracks 12 miles away and not brought back to Monticello for arraignment until 2:30 P.M. In my view the police were guilty of violating the positive command of our Legislature to arraign without unreasonable delay a person taken into custody (Code Crim. Pro., § 165). I have no serious quarrel with the majority as to the other points raised by the defendant. Yet, when they are considered *in toto* they do not indicate an air of courtroom fairness and impartiality. It cannot be overemphasized that our legal system is concerned as much with the integrity of the judicial process as with the issue of guilt or innocence.