**UNITED STATES of America ex rel. Louis Henry BURNS, Relator-Appellant,**

v.

**J. Edwin LaVALLEE, Warden, Clinton State Prison, Dannemora, New York, Respondent-Appellee.**

**No. 238, Docket 34246.**

United States Court of Appeals, Second Circuit.

Argued Nov. 18, 1970.

Decided Dec. 21, 1970.

---

Robert B. Fiske, Jr., New York City, for relator-appellant.

Louis J. Lefkowitz, Atty. Gen., New York City, for respondent-appellee.

Before KAUFMAN, HAYS and GIBBONS,* Circuit Judges.

GIBBONS, Circuit Judge:

Appellant was convicted by a jury of second degree murder in the County Court of Sullivan County on January 26, 1966. On March 8, 1966 he was sentenced to twenty years to life imprisonment, and he is still in custody. On direct appeal his conviction was affirmed by the Appellate Division, 27 A.D.2d 861, 277 N.Y.S.2d 530, 531 (3rd Dep't 1967). The Court of Appeals of the State of New York affirmed without opinion, 20 N.Y.2d 814, 284 N.Y.S.2d 705, 231 N.E.2d 291, rearg. den., 21 N.

Y.2d 774, 289 N.Y.S.2d 1029, 235 N.E.2d 228 (1968). Certiorari was denied. 391 U.S. 956, 88 S.Ct. 1862, 20 L.Ed.2d 870 (1968). Appellant then filed a petition for a writ of habeas corpus. On the basis of the state court record, without a hearing, the district court denied the writ, and this appeal followed. It raises two issues:

(1) Were certain incriminating statements admitted against appellant in the state trial voluntary?

(2) Was the delay in appellant's arraignment on the charge of which he was convicted a violation of federally protected constitutional rights?

Because of the disposition which we make, we reach only the first issue. We hold that on the undisputed historical facts as found in the New York state court proceedings certain inculpatory statements admitted in evidence against appellant were involuntary as a matter of federal constitutional law.

The undisputed facts are these: In April of 1965 appellant, a 27 year old Negro male employed as a caddie at the Concord Hotel golf course, was living with one Doris Anderson at her home in Monticello, New York. Some time toward the end of April Doris Anderson disappeared, and some time early in May her disappearance was noted by the Monticello Police Department, which began an investigation.

On May 8, 1965 appellant was questioned briefly near Doris Anderson's house, where he was still living, about Doris Anderson's whereabouts. He denied knowledge of her whereabouts. On May 9, 1965 he was questioned at the golf course and later was taken in a police car by Lieutenant Yank and two other officers of the Monticello Police Department to the Monticello police station, where he was questioned for about half an hour by several officers and then permitted to go. He explained his possession of Doris Anderson's car, and denied knowledge of her whereabouts.

* Of the United States Court of Appeals for the Third Circuit, sitting by designation.

On May 10, 1965 appellant arose about 6:00 A.M. and went to the golf course, where he caddied for 27 holes, with only a ten minute break for a sandwich. After work he returned to Doris Anderson's house to change clothes and proceeded to the Club Paradise in Monticello, intending to eat. However, Lieutenant Yank of the Monticello Police Department arrived at the Club Paradise accompanied by two state police officers, Investigators Buck and Scherpf. He was asked if he would go to Ferndale Barracks for further questioning relating to Doris Anderson's whereabouts, and he agreed to do so. He was taken in a police car from the Club Paradise, in the company of three officers, not to the nearby Monticello police station, where a magistrate was available but to the state police barracks at Ferndale, some 12 miles away. The party arrived at Ferndale Barracks at 5:30 P.M., and appellant was brought to a second floor interrogation room. He was not then warned of his right to counsel, or of his right to remain silent, or of the possibility that anything he said might be used against him. He had not technically been arrested, but patently he was the focus of a police inquiry into Doris Anderson's disappearance.

Between 5:30 P.M. and 6:30 P.M. appellant was interrogated by Investigators Buck and Scherpf and by Lieutenant Yank. At 6:30 P.M. Investigator Kalijan, a polygraph expert employed by the state police, arrived and from 6:30 P.M. to 9:00 P.M. he, Buck, Scherpf, and Yank continued the interrogation. Between 9:00 P.M. and 10:30 P.M. Investigator Kalijan administered a polygraph test. During these interrogations appellant made no incriminating admissions.

From 10:30 P.M. until 2:00 A.M. on May 11, 1965, appellant was questioned by Investigator Scherpf alone. From 2:00 A.M. until 4:15 A.M. he was questioned by Investigator Buck alone. Appellant did not sleep during this entire period. The disputed testimony, taken in the light most favorable to the interrogators, is that Investigator Scherpf gave him some pastry at some time between 9:00 P.M. and 11:00 P.M. During all this time the interrogators continued to demand that he tell what happened to Doris Anderson, and appellant continued to deny knowledge of her whereabouts. During all this time appellant was not technically under arrest. He was merely alone twelve miles from home, without transportation of his own, on the second floor of a police barracks, in the middle of the night, in the custody of relays of interrogators. He still had received no fifth amendment or sixth amendment warnings.

At 4:30 A.M. Lieutenant Yank entered the interrogation room. At that point appellant broke down and cried and admitted that he had killed Doris Anderson accidentally in the course of a struggle. He gave a detailed version of the circumstances leading up to a fight with Doris Anderson, of her assault against him first with a whisky bottle and then with a rifle, and of an accidental discharge of the rifle as he struggled to wrest it from her hands. He admitted to a state of panic in which he concealed the evidence of Doris' death, and he agreed to show the police where the body was buried. Accepting that testimony most favorable to the police, appellant was given a sandwich and coffee about this time. One officer said it was only coffee.

After he told this story appellant was formally arrested for homicide although his admissions established only an accidental death. About this time, accepting that version of the testimony most favorable to the police, he was told that he could remain silent and was entitled to counsel, but he agreed, instead, to show the police where Doris Anderson was buried.

No effort was made at this point to arraign him. Instead, an imposing company was gathered to accompany appellant in handcuffs to the grave site just outside Monticello which he had described. This company included the District Attorney of Sullivan County, the

Sullivan County Coroner, seven state police officials, the Chief, a Lieutenant, and a number of uniformed policemen of the Monticello Police Department.

After locating Doris Anderson's body where appellant said he had buried it, the police party then took appellant to the home which he had shared with the decedent in Monticello. There, at the officers' request and in the presence of the District Attorney, he enacted the circumstances of his struggle with Doris and her accidental death.

It was now at least 8:00 A.M., and a magistrate was available in Monticello. Appellant was not arraigned however, nor was he taken to the Monticello police station. Instead he was returned to Ferndale, where he was given some pastry to eat.

Here a new phase of interrogation began. Investigator Buck would ask a question, Investigator Scherpf would type the question, appellant would answer. Scherpf would type the answer. Preparation of a six and one-half page statement took no less than three hours. Through the first five and one-half pages that statement is consistent with the accidental shooting which he had admitted at 4:30 A.M. Beginning on the middle of page six this appears:

Q. Now I want to ask you if everything you gave me in this statement is the truth to the best of your knowledge? A. No, I made a mistake in the beginning.

Q. Where did you make this mistake? A. In the statement about the scuffle with DORIS.

Q. If it was a mistake, what did really happen? A. In the part where I have told you that DORIS and I scuffled for the 22 rifle and it discharged striking her in the head. What really happened was that we were scuffling for the rifle and in the bedroom it discharged missing DORIS

striking the wall dividing the living room from the bedroom. I pulled the rifle from her and said "Bitch, why would you want to shoot me what have I done to you." I turned around cranked another shell into the rifle I came back at DORIS with the rifle, she was falling onto the bed and the rifle fired striking her in the head. This is the only part of the whole thing that was a misstatement.

Q. Are you sure that this is how the incident occurred? A. Yes.

Q. Are there any other corrections you care to make other than this? A. No, all the statements that I made inclusive of the last one are true.

The change in appellant's story from an accidental to a deliberate shooting occurred at about 11:45 A.M., more than seven hours after his formal arrest on a homicide charge, after over eighteen hours of uninterrupted custodial interrogation, after he had been without sleep, and almost without food, for thirty hours.

This changed statement was the sole piece of evidence sufficient to sustain appellant's conviction for second degree murder.

Some time after 11:45 A.M. appellant read and signed this statement. He was then fingerprinted. About midday, his wife and father-in-law arrived at Ferndale and asked to see him but they were told they could not until he was arraigned.

Finally, at 2:30 P.M. appellant was returned to Monticello, taken before a magistrate, and arraigned twenty-one hours after his custodial interrogation began, ten hours after his formal arrest, and thirty-two hours after he had last slept. No reason is put forward by the State of New York in explanation of this delay.

Prior to his jury trial appellant had the benefit of a "Huntley" hearing [1] be-

---

1. New York procedure for compliance with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), whereby issue of voluntariness is determined by judge at hearing outside the presence of the jury, and if the judge finds the confession to be voluntary, it is admitted into evidence and the jury must also pass

fore a judge of the county court of Sullivan County. The facts set forth hereinabove are taken almost entirely from the 514 page transcript of that hearing. The Huntley court found:

### Conclusions of Law

The court after an examination and consideration of all the testimony finds beyond a reasonable doubt:

(1) That the oral and written inculpatory statements were not obtained as a result of any coercion, physical or otherwise.

\* \* \* \* \* \*

(3) That the said alleged inculpatory statements, both oral and in writing, are voluntary ones.

At the trial the statements were admitted in evidence and the issue of voluntariness was submitted to the jury, which convicted. The Appellate Division approved the Huntley findings. The district court, citing Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963), refused to override what it described as satisfactory state court factual findings.

We cannot agree. Accepting the state court findings of the historical facts as true, we conclude that the written statement obtained from appellant at 11:45 A.M. on May 11, 1965 was plainly involuntary, and that the contrary state conclusion[2] on this issue is "not fairly supported by the record." 28 U.S.C. § 2254(d) (8).[3] The undisputed facts (appellant's version is even more doleful) surrounding the obtaining of the written admissions which are the evidentiary basis for appellant's conviction on a charge of second degree murder establish that those written admissions were the result of impermissible coercion. A long line of cases in the Supreme Court, e. g., Darwin v. Connecti-

cut, 391 U.S. 346, 88 S.Ct. 1488, 20 L. Ed.2d 630 (1968); Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L. Ed.2d 513 (1963); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944), and in this court United States ex rel. Caminito v. Murphy, 222 F.2d 698 (2d Cir.), cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L. Ed. 788 (1955); United States ex rel. Wade v. Jackson, 256 F.2d 7 (2d Cir.), cert. denied, 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158 (1958); United States ex rel. Williams v. Fay, 323 F.2d 65 (2d Cir. 1963), cert. denied, 376 U.S. 915, 84 S.Ct. 667, 11 L.Ed.2d 611 (1964); United States ex rel. Everett v. Murphy, 329 F.2d 68 (2d Cir.), cert. denied, 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964), amply support that conclusion. No case has come to our attention in which in recent years any federal appellate court, faced with a totality of circumstances approaching those outlined hereinabove, approved use of defendant's confession.

The State correctly points out that appellant is not entitled to the benefit of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966) (Johnson v. New Jersey, 384 U.S. 719, 86 S. Ct. 1772, 16 L.Ed.2d 882 (1966)) and that a state court finding that he did not, during his long interrogation request counsel, precludes the application of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). But before either *Miranda* or *Escobedo* was decided a confession obtained in the to-

---

on voluntariness. See People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

2. Notably, the *Huntley* court designated its findings of absence of coercion and of voluntariness as conclusions of law.

3. We need not intimate our views as to whether 28 U.S.C. § 2254 does indeed apply to such a determination. See United States ex rel. Stephen J. B. v. Shelly, 430 F.2d 215, 218 n. 4 (2d Cir. 1970).

tality of circumstances here presented had on numerous occasions been held to be the product of impermissible coercion. It is true that in each case to which we refer the presence or absence of some single fact may serve to distinguish appellant's precise situation. The test, however, is the totality of circumstances and that test is amply met in the undisputed facts set forth in the state court record and in the per curiam opinion of the Appellate Division. See People v. Burns, 27 A.D.2d 861, 277 N.Y.S. 2d 530, 531 (3d Dep't 1967).

Since we conclude that the writ of habeas corpus must issue because of the use of a coerced confession, we have no occasion to consider appellant's alternative contention that the delay in his arraignment should induce us to apply McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) to criminal proceedings in New York State. See, however, Stein v. New York, 346 U.S. 156, 186–88, 73 S.Ct. 1077, 97 L. Ed. 1522 (1953); United States ex rel. Glinton v. Denno, 309 F.2d 543, 545 (2d Cir. 1962), cert. denied, 372 U.S. 938, 83 S.Ct. 886, 9 L.Ed.2d 769 (1963).

The state court has already stated " * * * it must be noted that defendant did not inculpate himself in an intended homicide until long after the typing of the question and answer statement had begun at 9 A.M." People v. Burns, *supra*, 27 A.D.2d at 865, 277 N. Y.S.2d at 534. Thus it seems unlikely that any retrial for homicide will be attempted since this sole incriminating statement may not be used. We do not here reach the question whether the nonincriminating oral admissions made at Ferndale Barracks at 4:30 A.M., at the grave site, or at Doris Anderson's home, would be admissible if other incriminating evidence could be found in substitution for the written statement.

Suffice it to say that we have strong doubts about the voluntariness under federal constitutional standards of anything that appellant did or said after 4:30 A.M.

We reverse the order appealed from denying the petition for the writ, and direct that a writ be issued at once requiring release of the petitioner unless he is promptly retried on the indictment.

Order reversed with directions to issue the writ applied for.