**UNITED STATES of America**

v.

**Miguel GUZMAN, et al., Defendants.**

**No. S597 CR 786 SAS.**

United States District Court,
S.D. New York.

Feb. 20, 1998.

M. Katherine Baird, Assistant United States Attorney, Southern District of New York, New York City, Robin L. Baker, Assistant United States Attorney, Southern District of New York, New York City, for the Government.

Jerry Vasquez, New York City, for defendant Gregory Ayala.

Avraham C. Moskowitz, Moskowitz & Book, New York City, for defendant Gregory Ferguson.

Labe M. Richman, New York City, for defendant Miguel Guzman.

James Roth, Hurwitz, Stamper & Roth, New York City, for defendant Carlos Hernandez.

David S. Greenfield, New York City, for defendant Alonzo Jarrell.

Daniel Nobel, New York City, for defendant Kenneth Johnson.

Michael R. Young, New York City, for defendant William Licea.

Ernest H. Hammer, New York City, for defendant Rolando Lorenzo.

Harriet B. Rosen, New York City, for defendant Daniel Ortiz.

Mitchell Golub, New York City, for defendant Tommy Perez.

John H. Jacobs, New York City, Marion Seltzer, New York City, for defendant Edwin Rivera.

Martin Jay Seigel, New York City, for defendant Angel Santiago.

Thomas F.X. Dunn, New York City, for defendant Samuel James Smith.

Richard Brewster, New York City, for defenant Pablo Vilella.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendant Miguel Guzman ("Guzman" or "defendant") is charged in a multi-defendant, multi-count RICO and drug conspiracy indictment. The Government alleges that he was the leader of a gang known as "Power Rules," and that this group engaged in murder, armed robbery, extortion and large-scale drug dealing. Guzman now moves to suppress a statement he made to Detective Loser James Lane of the New York City Police Department ("NYPD") on November 10, 1994, regarding the attempted murder of Pedro Mercado, which occurred on November 8, 1994. While Guzman was never charged with this attempted murder by the state authorities,[1] he is now charged with conspiracy to murder Pedro Mercado and the attempted murder of Mercado and Amauri Avalo, an off-duty police officer. *See* Counts One, Two, Five, Six, Seven and Thirty Five of the Indictment.[2] Guzman contends that the statement was obtained in violation of his constitutional rights. A hearing on this motion was held on December 8 and 30, 1997 and on January 15, 1998. Because defendant

---

1. The state authorities did arrest Tommy Perez, a co-defendant in this indictment, for the shooting of Mercado and Avalo.

2. At trial, the Government intends to prove that Miguel Guzman was the shooter and that Tommy Perez was the driver in the attempted murder of Pedro Mercado. *See* Government Letter to Defense Counsel, January 6, 1998.

was in custody when he made the statement and *Miranda* warnings were not given, Guzman's motion to suppress his statement is granted. However, because Guzman's substantive constitutional rights were not violated, his motion to suppress evidence derived from his statement is denied.

## I. Factual Background

On the afternoon of November 9, 1994, Guzman beeped Police Officer Robert Grant ("Grant"), an officer to whom he had previously provided information. Transcript of Hearing ("TR") at 159. When Grant called him back, Guzman asked why the cops were looking for him. TR at 159, 172. Grant testified that after he checked with his office he learned that a cop had been shot and that Guzman was "around when it happened." TR at 161. Grant then called Guzman and:

> told him that they [the police] were looking for him because there was a cop shot. And there were people in the neighborhood that said he had something to do with it, that he was either driving the car or inside the car that the person that did the shooting got into.

TR. at 174. Guzman, in turn, told Grant that he feared the cops who were looking for him, but would speak with Grant on the street. TR at 162.

Before going out to speak to Guzman, Grant returned to his precinct and met with Lieutenant Bramble, who decided that he and Detective Lane would accompany Grant when Grant spoke to Guzman. Grant testified that as a result of the meeting, "we decided we were going to bring Miguel to the precinct [to take a statement]." TR at 177. The officers then went to find Guzman at his home on Union Ave. in the Bronx. When Grant saw Guzman, "he told [Guzman] he would *have* to come with us to the 40th Precinct." TR at 164 (emphasis added).[3] Guzman was then driven to the precinct in a police vehicle. TR 1/15/98 at 12. Grant conceded that Guzman was not given Miranda warnings on the street or during the ride to the precinct. TR at 180.

Guzman was questioned at the precinct from approximately 4:00 p.m. until at least 5:00 a.m. the next morning. TR at 181, 185, 305. During these hours he was questioned in an interview room, primarily by Grant, who testified that Guzman was a "suspect" in the investigation. TR at 181. Initially, Guzman stated that "he had nothing to do with the shooting, he wasn't there." TR at 165. Not satisfied with Guzman's statement, Grant "explained to him the information I got and other detectives in my office got, was that he [Guzman] was either driving the car or had gotten into the car that the person that did the shooting got into." *Id.* Grant testified that his technique of questioning Guzman was to meet his denials with more information that contradicted those denials:

> When I first asked him what happened, I just asked him, as it went on I said, listen, we got somebody that said, we saw you running away. He denied he was there. Then I told him his car was supposedly at the scene. And it goes on from that point.

TR at 189;[4] *see also* TR at 191 ("I just kept asking him what happened. I told him that I knew he was there, that there were people that were going to say that he was there.") and TR at 309 ("Q: And you continued to confront him with information that you had, correct? A: Right."). Eventually, after five or six hours of questioning, Guzman stated that although he was not at the shooting he

---

**3.** Grant also testified, "I told him he *needed* to come with us to the precinct and we would talk to him about what happened there." TR at 177 (emphasis added). Grant testified that he never told him he did not have to come if he did not want to. TR at 178.

**4.** Grant reluctantly testified that at the time of the interrogation he had information sufficient to charge Guzman with being an accessory to the shooting:

> Q: You had information that he was seen leaving the scene as the driver, correct?

> A: That's the information I got, yes.
> Q: And if you were the driver of a get away car, you are an accessory to the shoot, correct?
> The Court: Was that your view, what the lawyer just said?
> A: No.
> The Court: What's your view of the responsibility of the person who drives the get away car?
> A: Well, normally, yes, but. . . .

TR at 188.

had heard about it. He stated that Tommy Perez was the person that did the shooting. He described Perez and the vicinity in which he could be found. *See* Gov't Exhibit 350, Report of Detective Robert Lane. Lieutenant Bramble testified that Guzman "place[d] himself in the car prior to the shooting ... told us where the car could be found ... [and] may have even told us the plate number for the car." TR 1/15/98 at 21.

The Government concedes that at no time during the all-night questioning was Guzman given Miranda warnings. *See* Government's Memorandum of Law in opposition to Miguel Guzman's Motion to Suppress His Statement Made November 9, 1994 ("Gov't Mem.") at 4; TR at 208 (Lane). In addition, both Grant and Lane testified that Guzman was never told that he was free to leave the precinct. TR at 190, 208.[5] Finally, Lane confirmed that whenever Guzman was moved within the precinct building, "someone would come in and say come with me, and he would be taken to another room." TR at 235.

Early on the morning of November 10, 1994, the officers went to Holland Ave. in the Bronx to locate Guzman's car, guided by information Guzman provided during the interrogation. TR at 228; TR 1/15/98 at 15. At that time, they believed that this car was used in the shooting they were investigating. TR at 187 ("Q: And you also stated that his car matched the description of the car seen leaving the scene, correct? A: That's what I just said."). As noted earlier, Lieutenant Bramble testified that Guzman "told us where the car could be found." TR 1/15/98 at 21. Bramble further testified that he did not believe Grant had any information about the car prior to speaking to Guzman. *See id.* at 22.

## II. Were Guzman's Miranda Rights Violated?

Guzman argues that his statement must be suppressed under the rule established in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Government, in turn, argues that there was no

Miranda violation because defendant was not "in custody" for *Miranda* purposes.

### A. Applicable Law

*Miranda*, of course, holds that statements made to law enforcement officers during a custodial interrogation are inadmissible unless the suspect was first informed of certain rights and voluntarily decided to forgo those rights. *See id.* at 444, 86 S.Ct. 1602. The government concedes that Guzman was not informed of his *Miranda* rights on either the night of November 9, 1994 or the morning of November 10, 1994. The only issue as to the admissibility of the statement he made at that time, therefore, is whether he was "in custody" when the statements were made.

The Second Circuit has recently restated the test used to address this question: "[T]wo discrete inquiries are involved in determining whether a person is 'in custody' for *Miranda* purposes: 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *Tankleff v. D.A. Senkowski*, 135 F.3d 235, 243 (2d Cir.1998) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). The latter inquiry is often addressed with reference to the following factors: 1) Whether the suspect is or is not told that he is free to leave, 2) the location and atmosphere of the interrogation, 3) the language and tone used by the police, 4) whether the suspect is searched or frisked, and 5) the length of the interrogation. *See id.* at 243–44 (citing, respectively, *Campaneria v. Reid*, 891 F.2d 1014, 1021 n. 1 (2d Cir.1989); *Oregon v. Mathiason*, 429 U.S. 492, 494–94, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *United States v. Guarno*, 819 F.2d 28, 31–32 (2d Cir.1987); *United States v. Wilson*, 901 F.Supp. 172, 175 (S.D.N.Y.1995); *Berkemer v. McCarty*, 468 U.S. 420, 437–38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

In *Tankleff*, a habeas challenge to a state court conviction, the court addressed the question of whether a statement by a murder

---

**5.** It must also be noted that Guzman never asked to end the interview or leave the police station.

TR at 168, 194, 243.

suspect should have been suppressed. There, the seventeen-year old suspect was questioned from approximately 6:00 a.m. until noon without *Miranda* warnings. He was initially questioned near his residence, but agreed to go to the police station at approximately 8:40 a.m. At 9:40 a.m. he was taken to a small room in the station where he was questioned for the next two hours. The detectives who conducted the interview told the suspect that they found his story "ridiculous and unbelievably absurd." *Tankleff*, 135 F.3d at 240. They eventually told him that a witness had identified him, a statement they knew to be false. Eventually the suspect asked, "[c]ould I have blacked out and done it?" *Id.* At this point, the police gave him his *Miranda* warnings for the first time. The suspect then waived those rights and confessed. *See id.* at 241.

The trial court denied Tankleff's motion to suppress, a decision that was upheld by both the appellate division and the New York Court of Appeals. Nevertheless, the Second Circuit found, based on the standards set forth in *Thompson v. Keohane, supra,* that the suspect was "in custody" at the time he made his statement and that his *Miranda* rights were therefore violated. As a result, *Miranda* was violated and the suspect's initial statement should have been suppressed. *See Tankleff,* 135 F.3d at 243. The court also addressed whether the statements made after the Miranda warnings were given should have been suppressed. Although the court found it to be a very close question, it held that "the interrogation that took place before the reading of the *Miranda* warnings barely did not entail that degree of coercion that would irredeemably taint Tankleff's 'second,' Mirandized confession." *Id.* at 245.[6]

In addressing the first of the two *Thompson* factors the circumstances surrounding the interrogation—the *Tankleff* court made the following finding. "In the case before us, the first determination—'what happened'—is not really in dispute. The police interrogated Tankleff on and off from 6:17 to 11:54 a.m. without giving him Miranda warnings." *Tankleff*, 135 F.3d at 243. The court then went on to state, "[t]he only dispute is over the ultimate legal issue—whether Tankleff was 'in custody' at any point before 11:54 a.m." *Id.* The analysis that must be undertaken here is nearly identical.

## B. Application of Law to Facts

In conducting the inquiry required by *Thompson* and *Tankleff,* the first question is what were the circumstances surrounding the interrogation. The answer here is straightforward. Guzman was required to come to the police station where he was questioned for more than twelve hours without receiving *Miranda* warnings. The second question is, given those circumstances, "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave?" *Thompson,* 116 S.Ct. at 465. In making this determination, a court must determine "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). As noted above, courts have looked at several factors in making this determination. It is useful to briefly analyze the facts relevant to each of those factors here.

Guzman was told he had to go to the station in a police car. He was told by the police that people in the neighborhood had said that he had something to do with the shooting. He was never told that he did not have to come to the station or that he was free to leave once he was there. He was questioned at police station by a number of different officers throughout the night for more than twelve hours, and his interrogators repeatedly told him that they knew that the answers he was giving were contradicted

---

6. The court relied on *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) in reaching this decision. The Government here relies on the same case. In *Elstad,* the Court stated:
"it is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309, 105 S.Ct. 1285.

by facts known to the police. He was never free to move around the station house unescorted. The only factor that favors the conclusion that a reasonable person would have felt free to leave was the absence of any search, frisk or pat down. Every other factor set forth in *Tankleff*, favors the conclusion that a reasonable person in Guzman's position would not "have felt he or she was [ ] free to terminate the interrogation and leave." *Thompson*, 116 S.Ct. at 465.

Based on the totality of the circumstances, I find that Guzman was in custody and was entitled to *Miranda* warnings long before he made the statement regarding the shooting and provided the information as to the location of his car. Accordingly, his custodial statement must be suppressed.

### III. Must the Physical Evidence Seized as a Result of the Interrogation be Suppressed?

Guzman argues that in light of the violation of his *Miranda* rights, his car, as well as any evidence seized from it, should be suppressed as "fruits of the poisonous tree" under the rule established in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In response, the Government contends that the fruit of the poisonous tree doctrine does not apply to *Miranda* violations.

### A. Applicable Law

█ Evidence derived from an unconstitutional search or interrogation is "fruit of the poisonous tree" and is inadmissible at trial. *Wong Sun*, 371 U.S. at 484–85, 83 S.Ct. 407 (1963); *Elstad*, 470 U.S. at 306–07, 105 S.Ct. 1285 (1985) ("The Fifth Amendment prohibits the use by the prosecution in its case in chief … of compelled testimony.").[7] *Miranda* rights, however, are "prophylactic standards" rather than independent constitutional rights. *Michigan v. Tucker*, 417 U.S. 433, 445, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *United States v. Morales*, 788 F.2d

883, 886 (2d Cir.1986). Thus, while statements obtained in violation of *Miranda* are inadmissible at trial, this rule does not necessarily apply to evidence discovered as a result of such statements.

In *Tucker*, for example, the Court held that the testimony of a witness who was identified as a result of a statement obtained in violation of *Miranda* was admissible, though the statement itself was not. *See* 417 U.S. at 450–51, 94 S.Ct. 2357. In light of the fact that the suspect's statement was voluntary, not self-inculpatory, and was obtained without unreasonable police conduct, the Court reasoned that neither the misconduct-deterrence policy of the Fourth Amendment nor the trustworthiness policy of the Fifth Amendment would be significantly advanced by exclusion of the derivative evidence. *See id.* at 446–50, 94 S.Ct. 2357. However, because the investigation at issue in *Tucker* occurred before *Miranda* had been decided, and the officers' conduct complied with then-prevailing constitutional standards, the scope of the *Tucker* holding was questionable with regard to interrogations conducted after *Miranda* was decided.

Questions about *Tucker's* continuing vitality were answered by the Supreme Court's decision in *Elstad*. Relying on a broad reading of *Tucker*, the Court there held that a confession obtained in violation of *Miranda* did not render inadmissible a second confession given after *Miranda* warnings had been provided. The Court reasoned that because the second statement had been voluntarily made and the police had not used any "coercion or improper tactics" in obtaining it, its exclusion was unwarranted. *See id.* At 308–09.[8]

Neither *Tucker* nor *Elstad* addressed the question of physical evidence located as a result of a custodial interrogation that violated *Miranda*. *See Patterson v. United States*, 485 U.S. 922, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988) (BRENNAN, J. and WHITE, J., dissenting from denial of certio-

---

7. "Derivative" evidence includes, inter alia, physical evidence discovered as a result of police questioning. *United States v. Elie*, 111 F.3d 1135, 1140 (4th Cir.1997).

8. The *Tankleff* court, citing *Elstad*, recently applied this principle in finding that a confession given by a seventeen-year old suspect after nearly six hours of hostile interrogation was not the product of coercion. *See* 135 F.3d at 245.

rari on the ground that lower courts were divided on the issue); *Elstad,* 470 U.S. at 347 n. 29, 105 S.Ct. 1285 (BRENNAN, J., dissenting,' noting that the *Elstad* majority did not reach the issue). Since *Elstad* was decided, however, an overwhelming majority of lower courts have found its reasoning to be applicable to the seizure of physical evidence. *See United States v. Elie,* 111 F.3d 1135, 1142 (4th Cir.1997) (Weapons "obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment [were not excludable as] 'fruit of the poisonous tree.' "); *U.S. v. Mendez,* 27 F.3d 126, 130 (5th Cir.1994) ("A mere violation of Miranda's 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine. The derivative evidence rule operates only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion."); *accord United States v. Wiley,* 997 F.2d 378, 382–83 (8th Cir.1993); *United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1047–48 (9th Cir.1990); *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1515 (6th Cir.1988); *United States v. Montoya–Robles,* 935 F.Supp. 1196, 1203–04 (D.Utah 1996); *United States v. Kirsteins,* 87–CV–964, 1989 WL 98628 (N.D.N.Y. Aug.22, 1989), *rev'd on other grounds,* 906 F.2d 919 (2d Cir.1990); *see also* Wayne R. LeFave & Jerold H. Israel, Criminal Procedure, § 9.5(b), at 201 (Supp.1991) ("*Elstad* only rejected application of the fruits doctrine as applied to a subsequent confession, but there is much in the Court's opinion that suggests that the fruits doctrine should also be inapplicable to physical evidence acquired through a *Miranda*-violative confession."). Though the Second Circuit has not yet had occasion to provide its views, it has given relatively narrow scope to the *Miranda* exclusionary rule in related contexts. *See Morales,* 788 F.2d at 885–87 (citing *Elstad* and concluding that in the absence of "trickery or coercion" on the part of the police, a suspect's unwarned confession provided probable cause to arrest him).[9]

■ Like the above-cited courts, I find that the reasoning of *Elstad* and *Tucker* is as applicable to derivative physical evidence as it is to derivative testimonial evidence: In terms of the deterrence and reliability-insuring purposes of the Fourth and Fifth Amendments, exclusion of the former is indistinguishable from exclusion of the latter. Therefore, physical evidence derived from a statement obtained in violation of *Miranda* is admissible absent evidence of coercion or other misconduct on the part of law enforcement officers sufficiently egregious to offend due process. *Elstad,* 470 U.S. at 304, 105 S.Ct. 1285 (citing *Haynes v. Washington,* 373 U.S. 503, 514–15, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)).

### B. Application of Law to Facts

■ No such misconduct was present in this case. Guzman suggests that his statement was coerced in that it was made late at night, when a lack of sleep had presumably depressed his mental acuity. There is no question but that sleep deprivation can be a tool of coercion. *See, e.g., Ashcraft v. Tennessee,* 322 U.S. 143, 153, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (confession made after thirty six hours of continuous questioning was involuntary); *United States v. LaVallee,* 436 F.2d 1352, 1355 (2d Cir.1970) (the fact that suspect had not slept for thirty hours when he confessed contributed to court's finding of involuntariness)). Here, however, there is no evidence to suggest that Guzman expressed any fatigue he felt, or that he indicated a desire to end the interrogation. Absent such evidence, I cannot conclude that continuing the interview until the morning offended due process or deprived Guzman of his free will.[10] *See U.S. ex rel. Daniel v.*

9. *See also United States v. Jimenez,* 789 F.2d 167, 171 (2d Cir.1986). The majority opinion did not address the issue, but Judge Cardamone stated in his dissent that

[i]n *Elstad,* the Supreme Court observed that while an unwarned admission taken in violation of *Miranda* would be suppressed, the fruits of that confession, including subsequent confessions, witnesses, or *physical evidence,* would

not be similarly suppressed unless the initial confession was coerced and involuntarily made in violation of the Fifth Amendment. (emphasis added).

10. I note in this regard that while the interrogation lasted all night, Guzman disclosed the location of the car at least by 12:40 a.m., when the car was seized. TR at 211–28.

*Wilkins,* 292 F.2d 348, 349–50 (2d Cir.1961) (confession voluntary though coming after sixteen hours of almost continuous questioning, beginning at midnight, when no claim of fatigue was made).

Guzman also argues that the police engaged in improper trickery when Grant told Guzman that he had been seen in the car used in the shooting. Grant testified that he was informed of Guzman's alleged involvement by Lieutenant Bramble. TR at 161. Bramble, in turn, testified that the basis of this allegation was evidence that Guzman had been seen in a maroon car, and that the car involved in the attack was maroon. TR 1/15/98 at 14. Thus it appears that Bramble, through Grant, exaggerated the extent of the evidence against Guzman during the interrogation. As Guzman suggests, this exaggeration may have been a purposeful attempt to gain leverage over him. Even if this is true, however, such mild deceit does not amount to a due process violation. *See Tankleff,* 135 F.3d at 245 (confession voluntary despite officer's false statement that victim had been revived from a coma and had accused the confessor), *see also Frazier v. Cupp,* 394 U.S. 731, 738, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (false statement by police that suspect's cousin, with whom suspect had claimed to spend the evening in question, had already confessed to the crime was insufficient to render the suspect's confession involuntary).

As I have discussed, of course, the police here did engage in "misconduct" in the sense that they failed to provide the warnings required by *Miranda* before they initiated a custodial interrogation of Guzman. However, *Elstad* and *Tucker* make clear that a violation of *Miranda,* standing alone, does not amount to a violation of a substantive constitutional right. *See Elstad,* 470 U.S. at 304, 105 S.Ct. 1285. Because the failure to mirandize Guzman prior to interrogation was the officers' only constitutionally significant misconduct, the physical evidence derived from that interrogation—the car and its contents—is admissible.

## IV. CONCLUSION

For the reasons discussed above, the questioning of Guzman on November 9 and 10, 1994 was unlawful and any statement he made at that time must be suppressed. However, the physical evidence found as a result of that interrogation was not procured involuntarily and may therefore be admitted at trial.

SO ORDERED.