**Willie James ROBINSON, Petitioner,**

v.

**Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent.**

No. Civ–1973–349.

United States District Court,
W. D. New York.

May 9, 1978.

Philip Halpern, Buffalo, N. Y. (Ingrid K. Hansen, Kew Gardens, N. Y., of counsel), for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Albany, N. Y. (James L. Kennedy, Buffalo, N. Y., of counsel), for respondent.

CURTIN, Chief Judge.

On April 18, 1959, Henry Duscher, owner of a delicatessen which was located at the corner of Delaware Avenue and Sanders Road in Buffalo, New York, was shot and killed in the course of a robbery at his store. Petitioner Willie James Robinson and codefendants Alphonso Williams and Ernest Jackson were tried for this crime and were convicted on October 23, 1959 in Erie County Court following a jury trial. All three were sentenced to life imprisonment. Petitioner and codefendant Jackson appealed their convictions and the Appellate Division, Fourth Department, reversed and ordered a new trial. 16 A.D.2d 184, 224 N.Y. S.2d 705 (4th Dept. 1962). Alphonso Williams did not appeal his conviction.

Petitioner's second trial also resulted in a conviction for first degree murder. The jury's recommendation of leniency was disregarded by the trial judge and petitioner and his codefendant Jackson were sentenced to death. Petitioner was confined for a period of time on death row at Sing

Sing State Prison (Ossining Correctional Facility) before his conviction was reversed by the New York State Court of Appeals on December 30, 1963, and a new trial was ordered. 13 N.Y.2d 296, 246 N.Y.S.2d 623, 196 N.E.2d 261 (1963). Thereafter the indictment against Ernest Jackson was dismissed and petitioner was tried for the third time, alone. Petitioner was again convicted on June 12, 1964. He appealed to the Appellate Division, Fourth Department, which reserved decision and remanded the case to the Erie County Court for a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y. S.2d 838, 204 N.E.2d 179 (1965), to determine the voluntariness of petitioner's confession which had been admitted into evidence at his third trial. 28 A.D.2d 816, 281 N.Y.S.2d 956 (4th Dept. 1967).

A suppression hearing was held before Erie County Court Judge Jacob A. Latona and, on December 29, 1967, Judge Latona ruled, in a detailed and well-reasoned opinion, that petitioner's confession had been involuntary and should be suppressed. However, the Appellate Division then reversed Judge Latona's decision "on the law and facts" and affirmed the conviction. 31 A.D.2d 724, 297 N.Y.S.2d 82 (4th Dept. 1968). Petitioner was denied leave to appeal this decision by the New York State Court of Appeals on April 1, 1969. He continues to serve the term of life imprisonment in the Attica Correctional Facility that was imposed on June 16, 1964.

Petitioner filed his application for writ of habeas corpus with this court on July 16, 1973. After respondent filed an answering affidavit on October 30, 1973, nothing further transpired in this matter until February 11, 1976, when Michael Davidson, Esq. was appointed to represent petitioner. An amended petition was filed in petitioner's behalf on March 24, 1976 and, on April 27, 1976, respondent filed a supplemental answer in which he acknowledged that peti-

tioner had exhausted his remedies in the New York State courts pursuant to 28 U.S.C. § 2254(b). The issues were then thoroughly briefed by both parties and petitioner's claims were argued before me on July 30, 1976. Subsequently Philip Halpern, Esq. was appointed to succeed Michael Davidson, Esq., as petitioner's counsel. Ernest L. Montanye has been succeeded by Harold J. Smith as superintendent of the Attica Correctional Facility.

Petitioner urges that his conviction, following his third trial, was unconstitutionally obtained through the prosecution's introduction into evidence of a coerced confession and other statements obtained from petitioner following an illegal arrest. Petitioner claims that this error was compounded and that he was further deprived of his right to due process of law when the trial judge failed to properly advise the jury as to the criteria it could consider in determining whether or not petitioner's confession had been voluntary. In addition, petitioner alleges that he was deprived of a fair trial when the prosecution placed his former codefendants on the witness stand only for the purpose of having them invoke their privilege against self-incrimination in the presence of the jurors.

My review of the record of petitioner's third trial, held in May and June, 1964, and of the Huntley Hearing held in October, 1967,[1] reveals the following facts concerning petitioner's confession. After Henry Duscher was robbed and shot to death on April 18, 1959, witnesses reported to the police that three black men, two of whom had entered the store and one who had driven the getaway car, had participated in the crime. During the course of the investigation, between 25 and 30 black men were picked up by law enforcement officials, were held without charges being brought against them, were questioned and were then released.

Following an anonymous tip that was received by the police on April 20, 1959,

---

1. In the course of this decision, the trial transcript will be identified as "T.T." The Huntley Hearing transcript will be referred to as "H.H."

petitioner Robinson, Alphonso Williams and a Bobbie Ferguson were taken to Police Headquarters for questioning. While at Police Headquarters, these three men were viewed by all of the known witnesses to the events surrounding the Duscher slaying. However, the witnesses failed to identify any of these suspects as being participants in the crime. Petitioner was questioned about his activities on the evening of April 18, 1959, and was then released.

On April 21, 1959, two detectives of the Buffalo Police Department were ordered to bring petitioner to Police Headquarters for questioning in the Duscher case. The basis for this order is not known. The detectives located petitioner at a William Street tavern shortly after midnight on April 22, 1959. The detectives advised petitioner that he was wanted for questioning in the Duscher case. They then proceeded to arrest him and to take him to Police Headquarters. When he arrived at Police Headquarters, petitioner was booked on a charge of first degree murder but he was not advised of this fact.

At this time, police were also holding two other men, Alphonso Williams and Ernest Jackson, as suspects in the Duscher case. In response to police interrogation, petitioner denied any knowledge of the crime although he did eventually admit that he knew Ernest Jackson.

Police officials, who believed that Jackson had been implicated in the Duscher murder based on information obtained by an informant in the cell next to Jackson's,[2] then devised a plan to elicit further information from the petitioner. A spurious confession, implicating petitioner as the "trigger man," was typed and one of the police officers signed Ernest Jackson's name to it. At about 6:00 a. m., petitioner was confronted with the spurious confes-sion. However, he initially continued to deny that he had any role in the Duscher killing. All but one officer then left the room. The remaining officer continued to speak with petitioner alone. During the course of questioning petitioner, this officer discussed the "benefits" of talking. Petitioner was told that he "should not be the fall guy" and that he should not put a rope around his own neck. (Huntley Hearing Transcript at 273). The officer advised petitioner that if he "told us the facts that he would probably receive the benefits of any leniency that may come to him in the courts." (H.H. at 274). However, petitioner was not advised that he might involve himself in a murder charge by making a statement to the officer. After about twenty minutes of questioning by this officer, petitioner told the officer "[i]t's a deal" (H.H. at 276), and then agreed to give the statement which is primarily at issue here.[3] During this interrogation by police officers, petitioner had not been advised of his right to counsel and his right to remain silent. Nor had he been told that his statements might be used against him. At the time that he agreed to make a statement, petitioner had been in police custody for seven hours, he had had little if any opportunity to sleep and he had not been given anything to eat.

Shortly after 10:00 a. m. on April 22, 1959, petitioner began to provide answers to the questions of the Erie County District Attorney. Petitioner's statement was not transcribed that day and, in fact, petitioner never did sign the statement.

To this point, there had been no effort to arraign the petitioner. Nor had he been advised that he had already been charged with murder. At about 12:00 noon, petitioner was taken to the police garage where

---

2. This constituted grounds for reversal of Jackson's second conviction for this crime. *People v. Robinson*, 13 N.Y.2d 296, 246 N.Y.S.2d 623, 196 N.E.2d 261 (1963).

3. Petitioner's statement implicating himself in the crime was read into the record at pages 762–781 of the trial transcript.

The record indicates that Alphonso Williams fired the fatal shots and that Ernest Jackson planned the robbery and drove the getaway car. Judge Latona, who presided over two of petitioner's three trials, concluded that, while petitioner had participated in the crime, "it wasn't born in his mind, nor was the death caused by his hand." (T.T. at 1046).

he was asked to identify the vehicle used in the robbery, which he did. At 2:00 p. m. on April 22, 1959, some fourteen hours after he had been taken into police custody, petitioner was arraigned on the murder charge.

Before discussing petitioner's substantive claims, I must first decide whether or not the exhaustion requirements of 28 U.S.C. § 2254(b) have been satisfied for petitioner's claim that his conviction was obtained in violation of the fourth amendment when the fruits of an illegal arrest were used as evidence against him. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Although petitioner has alleged that all issues have been previously presented to the New York State courts, including the appeals courts, before they were presented in this federal court, and respondent has acknowledged that the exhaustion requirement has been met, it became apparent from my review of the state court record and briefs on appeal that this may not have been the case. I then directed counsel for both parties to address this issue in supplemental memoranda which have now been filed with the court.

■ As the Second Circuit Court of Appeals has recently recognized, "it is elementary under *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), that a state prisoner who petitions for a writ of habeas corpus under 28 U.S.C. § 2254 must first exhaust his state remedies." *Wilson v. Fogg,* 571 F.2d 91, 92 (2d Cir. 1978). The petitioner must present to the state courts the same claim he urges upon the federal courts. *Wilson v. Fogg, supra; United States ex rel. Gibbs v. Zelker,* 496 F.2d 991, 994 (2d Cir. 1974); *United States ex rel. Nelson v. Zelker,* 465 F.2d 1121, 1124 (2d Cir.), *cert. denied* 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 497 (1972). My review of the record indicates that the matter of probable cause for petitioner's arrest on April 22, 1959 was explored at the Huntley Hearing, was addressed by petitioner's counsel in his closing remarks at that hear-

ing, and was also discussed by Judge Latona in his decision of December 29, 1967, finding that petitioner's confession had been involuntary. *Wong Sun,* which recognized that if a confession following an illegal arrest is to avoid suppression as "fruit of the poisonous tree," it must be shown to have been sufficiently an act of free will to purge the primary taint, was decided on January 14, 1963. *Traub v. Connecticut,* 374 U.S. 493, 83 S.Ct. 1899, 10 L.Ed.2d 1048, which applied the *Wong Sun* exclusionary rule to state court prosecutions, was decided on June 17, 1963. Petitioner's third trial, at issue here, began on May 18, 1964, well after the United States Supreme Court established in *Wong Sun* that the exclusionary rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), may apply to verbal statements that follow an illegal arrest. However, there is no indication in the trial record that petitioner's counsel urged that petitioner's confession be suppressed under the principle established in *Wong Sun.* The legal arguments supporting suppression of the confession under *Wong Sun* were neither presented to the Appellate Division, Fourth Department, upon petitioner's direct appeal following his third trial, nor were these arguments presented at the Huntley Hearing following the remand to the trial court by the Appellate Division.

■ I believe that the claim under *Wong Sun* and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), which petitioner has presented to this federal court is substantially different from that presented to the state courts. *See Allen v. County Court, Ulster County,* 568 F.2d 998 (2d Cir. 1977). Since petitioner has clearly failed to present this claim and legal argument to the New York State courts for their decision, I cannot address this issue here. *See Picard v. Connor, supra; Fielding v. LeFevre,* 548 F.2d 1102 (2d Cir. 1977).[4]

---

4. Since the issue of probable cause supporting the arrest of petitioner on April 22, 1959 was explored in some detail at the Huntley Hearing,

it would appear that petitioner has had an opportunity for a full and fair hearing on this claim. If it should become appropriate for peti-

Petitioner's primary claim is that his conviction was obtained in violation of the fourteenth amendment guarantee of due process of law when a coerced confession was introduced as evidence against him at his trial. While the People did call a number of witnesses who provided circumstantial evidence of the crime charged, it is clear that petitioner's confession was of critical importance.[5]

It is my duty in reviewing this habeas corpus petition to examine the entire record, including the Huntley Hearing and trial transcripts, and to independently determine whether on the basis of the undisputed facts there is merit to petitioner's claim that his confession was not voluntary. *United States ex rel. Wade v. Jackson,* 256 F.2d 7, 9 (2d Cir.), *cert. denied* 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158 (1958). *See also Clewis v. Texas,* 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Davis v. North Carolina,* 384 U.S. 737, 741–742, 36 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *Haynes v. Washington,* 373 U.S. 503, 515–516, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).[6] If my review of the undisputed facts indicates that petitioner's confession was coerced, then his conviction and detention have been obtained in violation of the due process clause of the fourteenth amendment.

The test of voluntariness of a confession is whether an examination of the totality of the circumstances indicates that the conduct of law enforcement officials

---

tioner to apply to the state courts and if those courts were then to rule on the applicability of *Wong Sun* to the facts of this claim, it would then appear that the requirements of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), will have been satisfied and that petitioner would then be precluded from pursuing his remedies related to this fourth amendment claim in federal court. The decision entered today would render such an application by petitioner unnecessary at this time.

5. Other than petitioner's own incriminating statements, the evidence of his involvement in the crime was all circumstantial in nature. No one testified that he or she had seen petitioner in Duscher's store at the time of the shooting. Not even James Orbin or Melvin Heinemann, who worked for Henry Duscher and who were in the storage room looking through a slot into the store at the time of the shooting, could say that petitioner was in the store during the robbery and shooting. A number of witnesses did testify that they had seen petitioner and another black man in Duscher's store on one or two occasions prior to the incident on that same evening. The defense established that all of these witnesses, who could identify petitioner at the trial as being one of the two black men in Duscher's store shortly before the shooting, had been unable to so identify petitioner in a lineup at police headquarters on April 20, 1959, two days after the incident. *See* T.T. at 222, 286, 346, 392, 655; H.H. at 49–51, 134–135.

Perhaps the most incriminating circumstantial evidence was the testimony of Melvin Heinemann, offered at petitioner's second trial and read into the record at the third trial. He testified that on the two occasions that he had seen petitioner in the store on the evening of April 18, 1959, prior to the shooting, he had observed a bag, with the initials "B.T." on it, on petitioner's arm. He further testified that after the shooting occurred, he had observed the same bag on the floor of the store. This same bag had been picked up in Duscher's store on the night of the shooting by Detective John C. Rapp and was introduced into evidence as People's Exhibit No. 32.

While this circumstantial evidence is certainly not inconsequential, it is clear that petitioner's incriminating statements were of considerable importance as part of the People's proof since there were no eyewitnesses to the actual crime or other concrete evidence, such as fingerprints, to link petitioner to the crime.

6. In this collateral federal proceeding, the findings of fact of the state courts are presumptively correct pursuant to 28 U.S.C. § 2254(d). *Tanner v. Vincent,* 541 F.2d 932, 937 (2d Cir. 1976), *cert. denied,* 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977); *United States ex rel. Regina v. LaVallee,* 504 F.2d 580, 582 (2d Cir. 1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1330, 43 L.Ed.2d 425 (1975). I have not taken issue with any of the detailed findings made by Judge Latona in his memorandum decision of December 29, 1967. In some instances I have elaborated on and augmented his findings based on my own review of the trial and Huntley Hearing transcripts. Pursuant to then-applicable § 543 of the Code of Criminal Procedure, the Appellate Division reversed Judge Latona's decision "on the law and facts" as previously noted. However, that court made few specific findings of fact and provided only skimpy analysis of the record.

In my own independent review of the record, I have resolved ambiguities against petitioner and have rested my decision on those facts which are contested neither by petitioner nor by the other witnesses who testified at the Huntley Hearing and trial.

was such as to overbear petitioner's will to resist and to bring about a confession that was not the product of a rational intellect and a free will. *United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). *See also Procunier v. Atchley,* 400 U.S. 446, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971); *Davis v. North Carolina, supra; Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). Justice Frankfurter has articulated the test of voluntariness which guides my review of petitioner's application in this court:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

*Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

In order to resolve this issue of voluntariness, I must consider and weigh all of the circumstances which surrounded petitioner's confession given to law enforcement authorities in 1959. Since *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have not been given retroactive effect [*Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966)], the admissibility of petitioner's statement must be governed by the then-existing contemporary case law elaborating the constitutional due process standard of voluntariness. Analysis of a variety of factors is required to resolve this issue.

### (1) *CIRCUMSTANCES OF THE DUSCHER MURDER INVESTIGATION.*

The Duscher murder investigation was widely publicized in the Buffalo community. Racial tensions were exacerbated by reports that three black males were responsible for the death of a white businessman whose store was located in a predominantly white neighborhood. Police activity was subjected to critical public scrutiny. Sometime shortly before the incident, a special group of police officers specifically assigned to North Buffalo where Henry Duscher's store was located had been disbanded and integrated into another squad. Referring to the Duscher case, a report in the Buffalo Evening News of April 20, 1959 noted that "[t]he slaying came embarrassingly soon after the disbanding of the North Side squad by Detective Chief John J. Whalen." (H.H. at 34). The News also reported that one hundred and fifty Buffalo police officers had participated in some phase of the investigation. (H.H. at 37–38). The news reports reflected obvious community pressure for the police to "get someone" for Duscher's murder.

Chief Whalen, who was responsible for supervising the investigation, testified that he was aware of the publicity that the investigation was receiving in the press. (H.H. at 39). Whalen acknowledged that a considerable number of police officers had been involved in the investigation, including many who had volunteered their time to investigate the case. Chief Whalen's best estimates were that sixty-five to one hundred, and maybe even more, officers had participated in some aspect of the investigation. Many officers who volunteered their time had been friends of the deceased.

As Judge Latona found, from April 18 to April 22 Buffalo police officers picked up twenty-five to thirty black men, held them without charge, questioned and released them. Although such dragnet practices in 1959 had not yet been explicitly condemned by the courts, this type of police activity certainly was not conducive to a careful and fair investigation. The fact that the police may have guessed correctly

in this instance does not justify their conduct during the course of the investigation and subsequent interrogation of the petitioner. *See Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Rogers v. Richmond,* 365 U.S. 534, 540–541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). *See generally Developments in the Law—Confessions,* 79 Harv.L.Rev. 935, 964–970 (1966).

### (2) *TIMING OF ARREST AND INTER-ROGATION.*

Petitioner was arrested at midnight in a tavern where he had been drinking. He was then questioned throughout the night and into the early morning. As discussed below, this arrest was without probable cause and followed an arrest made two days earlier for which there was also no showing of probable cause. The arrest and interrogation occurred at a time when an attorney would not be accessible and when family and friends would not be available to offer support to petitioner.

These police tactics were unnecessary, since petitioner had been available for questioning and a lineup at a more reasonable hour two days previous to this interrogation, and were intended to heighten the anxiety which petitioner would experience during the course of questioning. A fair reading of the whole record indicates that the purpose of the interrogation was to get a confession from petitioner if at all possible. The voluntary character of this desired confession was clearly lessened by the hour of the day that petitioner was arrested and interrogated and during which he first made the incriminating statements. *United States ex rel. Adams v. Bensinger,* 507 F.2d 390, 395 (7th Cir. 1974), *cert. denied* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 789 (1975).

### (3) *ILLEGAL ARREST.*[7]

■ Petitioner urges that his arrest on April 22, 1959 was illegal and that this is a coercive element that should be evaluated by the court in the voluntariness equation. In his decision following the Huntley Hearing, Judge Latona found that there had been no showing of legally sufficient probable cause to support petitioner's arrest. In reviewing Judge Latona's decision, the Appellate Division did not address this issue. I have been unable to uncover any testimony or other evidence in the record that would indicate that petitioner's arrest was based on probable cause. In fact, the arresting officers testified that when they arrested petitioner on April 22, 1959, without a warrant, they had no reason to believe that petitioner had committed a felony and they had no information other than an anonymous tip received by another detective that petitioner was even implicated in the Dushcer slaying. On the record presently before me, I must concur with Judge Latona that there was no probable cause to support petitioner's arrest on April 22, 1959. *See, e. g., Davis v. Mississippi,* 394 U.S. 721, 725, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Henry v. United States,* 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). *Cf. Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

A noted commentator, finding that a causal relationship exists between illegal arrests and subsequent confessions, has concluded that the eliciting of incriminating statements is a major purpose of unconstitutional arrest. *See* Kamisar, *Illegal Searches or Seizures and Contemporaneous Incriminating Statements: A Dialoque on a Neglected Area of Criminal Procedure,* 1961 U.Ill.L.F. 78, 122, n. 201. Another commentary has concluded that it is logical to view such an illegal arrest and subsequent interrogation as an indivisible illegal scheme and to exclude confessions that have been obtained pursuant to it. *See Developments in the Law—Confessions,* 79 Harv.L.Rev., *supra,* at 1026. This position has recently been articulated by the United States Supreme Court as well. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416

---

**7.** The claim that the illegal arrest should be evaluated as a coercive element is independent of the claim under *Wong Sun v. United States,* addressed above, that the confession following the illegal arrest should have been suppressed as "fruit of the poisonous tree."

(1975). *See also Wong Sun v. United States, supra.*

The Supreme Court has recognized that the fact that a statement was secured following "an initial taking-into-custody which was concededly not supported by probable cause" was among the factors which required the conclusion that a confession had not been voluntary. *Clewis v. Texas,* 386 U.S. 707, 711, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967). The Court of Appeals for the Second Circuit has indicated that the fact that a habeas corpus petitioner may originally have been arrested "in questionable circumstances" was among the factors to be evaluated in determining whether or not his will had been overborne. *United States ex rel. Lewis v. Henderson,* 520 F.2d 896, 902 (2d Cir.), *cert. denied,* 423 U.S. 998, 96 S.Ct. 429, 46 L.Ed.2d 373 (1975).[8] *But see United States ex rel. Walters v. Reincke,* 323 F.Supp. 434 (D.Conn.1969), *aff'd* 435 F.2d 149 (2d Cir. 1970).

In the case before me, the illegal arrest enabled the police to effectively assert their authority over petitioner, to hold him incommunicado for an indefinite period of time at police headquarters and to subject him to extensive interrogation while he was illegally detained. I agree with Professor Kamisar that such practices facilitate and often accompany third-degree methods. *See also Stein v. New York,* 346 U.S. 156, 187, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). The fact that an illegal arrest was directly antecedent to petitioner's confession is relevant circumstantial evidence which weighs in his favor.

(4) *PETITIONER'S BACKGROUND.* [See *Fikes v. Alabama,* 352 U.S. 191, 193, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); *United States ex rel. Lewis v. Henderson, supra,* 520 F.2d at 901].

Petitioner's educational background was limited to a fifth grade education in Deats-ville, Alabama schools. By affidavit which has not been opposed by respondent, petitioner claims that he had never previously been exposed to prolonged police interrogation. While petitioner had had some contacts with law enforcement authorities prior to 1959,[9] he could not be classified as an experienced criminal familiar with police methods. *Cf. Stein v. New York, supra,* 346 U.S. at 185–186, 73 S.Ct. 1077.

Petitioner was 34 at the time of his arrest and interrogation in 1959. Age was thus not a significant factor which weighs in petitioner's favor. *Cf. Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). However, there is no showing in the record that the police were dealing with a "knowledgeable" suspect, one who was aware of the consequences of his admissions or of the tactical advantages, such as bargaining for a lesser charge or reduced sentence in return for a guilty plea, that can be gained by silence during interrogation. It is reasonable to conclude from the record that at the time of the interrogation petitioner was not the equal of the police in knowledge and understanding of the consequences of the questions and answers being recorded (*Gallegos v. Colorado, supra,* 370 U.S. at 54, 82 S.Ct. 1209), and this fact weighs in petitioner's favor.

(5) *CIRCUMSTANCES OF INTERROGATION.*

Petitioner was subjected to approximately seven hours of intermittent questioning, conducted at different times by at least seven police officers, from the time he was picked up by police shortly after midnight until he first made incriminating statements sometime after 7:00 a. m. on April

---

8. On remand, the District Court found that the arrest of the petitioner had been supported by probable cause. *United States ex rel. Lewis v. Henderson,* 421 F.Supp. 674 (S.D.N.Y.1976).

9. Petitioner had been convicted of theft by force in 1947 and had served at least a short period of incarceration in a federal correctional facility for that conviction. He had also been convicted of petty larceny in 1949 and of unlawful entry in 1957.

22, 1959.[10] When compared with cases where lengthy interrogations were found to be coercive [see, e. g., Davis v. North Carolina, supra; United States ex rel. Burns v. LaVallee, 436 F.2d 1352 (2d Cir. 1970), cert. denied, 402 U.S. 1012, 91 S.Ct. 2190, 29 L.Ed.2d 436 (1971); United States ex rel. Weinstein v. Fay, 333 F.2d 815 (2d Cir. 1964)], the length of the interrogation under review would not appear to be a particularly significant factor. See United States v. Lind, 542 F.2d 598 (2d Cir. 1976), cert. denied, 430 U.S. 947, 97 S.Ct. 1585, 51 L.Ed.2d 796 (1977); United States ex rel. Coleman v. Mancusi, 423 F.2d 985 (2d Cir.), cert. denied, 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970).

However, it is significant that petitioner was held incommunicado in police headquarters until he confessed. During much of the 14-hour period preceding arraignment he was surrounded by police officers. He was not allowed to make telephone calls or to see or speak with anyone other than police. As the Second Circuit has recognized, "[t]his sort of isolation denies a defendant psychological support from friends, relatives and counsel, putting him at an extreme disadvantage when confronting the police." United States ex rel. Lewis v. Henderson, supra, 520 F.2d at 901. In addition, the fact that petitioner was not given any substantial food nor was he allowed to sleep until after his arraignment, which

took place on the afternoon following his late-night arrest, is relevant to the analysis. See Clewis v. Texas, supra; Payne v. Arkansas, 356 U.S. 560, 567, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).

## (6) DELAY IN ARRAIGNMENT.

Petitioner was arraigned at 2:00 p. m. on April 22, 1959, some fourteen hours after he had been arrested. Arraignment followed his confession to police officers, his incriminating statements made to the district attorney, and his identification of the automobile which had been used in the robbery. Petitioner argues that if he had been arraigned in a timely fashion, he would have been put on notice of the murder charge that was pending against him. While there is conflict in the testimony, it would appear that petitioner realized that he was a subject of the investigation into the Duscher robbery and murder case. However, it appears that petitioner did not realize that by admitting complicity in the robbery, he might implicate himself in a felony murder even though he did not pull the trigger.

Judge Latona concluded that no effort was made to arraign the petitioner before he made his incriminating statement to the district attorney, nor did the district attorney advise petitioner of the nature of the charge despite the fact that the district attorney knew that the defendant would incriminate himself in a felony murder when he gave his statement.

10. Judge Latona found that Robinson had been questioned "by at least seven officers in various locations at headquarters and at various times throughout the night." Latona Memo at 3. He also found that Robinson had been "without sleep throughout the night." Latona Memo at 5.

In reversing Judge Latona's decision, the Appellate Division found that Robinson had been questioned for two hours after he was first taken to police headquarters, that questioning was then interrupted for three or four hours and then continued for twenty or thirty minutes before the confession was given. That court also concluded that "[t]he loss of sleep occasioned by the period of questioning of the defendant beginning shortly after midnight cannot be considered particularly significant because of the limited questioning to which he was subjected and the long interruption between the periods of questioning." People v.

Robinson, 31 A.D.2d 724, 297 N.Y.S.2d 82, 84 (4th Dept. 1968).

My own review of the record indicates that petitioner testified that throughout the night and early morning he had been taken to and from a cell in Police Headquarters, questioned by a number of different officers both in the Homicide Bureau and elsewhere and that he had not been allowed to sleep. (T.T. at 511, 512). This testimony was not contradicted by any testimony offered by police officers.

Detective Thompson, one of the arresting officers, stated that, to the best of his recollection, petitioner had been in the Homicide Office from 3:00 a. m. to 4 or 5:00 a. m. on April 22, 1959. (H.H. at 154). While there is only skimpy testimony as to the nature of any interrogation which might have occurred between 2:30 a. m. and 6:00 a. m., there was no testimony offered by the People that interrogation had been halted during this time.

Mere delay between arrest and arraignment is not a ground for overturning a *state* conviction based upon a confession. *United States ex rel. Peterson v. LaVallee*, 279 F.2d 396 (2d Cir.), *cert. denied*, 364 U.S. 922, 81 S.Ct. 289, 5 L.Ed.2d 262 (1960). *Cf. Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). However, delay in arraigning the petitioner is a factor that should be balanced in the due process equation. *See Stroble v. State of California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952); *United States ex rel. Rosner v. Warden*, 329 F.Supp. 673, 675 (E.D.N.Y.1971).

The record indicates that the petitioner was arraigned at the time normally scheduled for felony arraignments in Buffalo City Court. There is no evidence of a subterfuge by police to avoid timely arraignment of the petitioner. However, the district attorney should have advised the petitioner of the nature of the charge pending against him and should have arranged for petitioner's arraignment before the incriminating statement was taken. Following such procedures would have assured that any subsequent statements made by petitioner would have been informed by his knowledge of the nature and seriousness of the charges pending against him.

(7) *FAILURE OF INTERROGATORS TO ADVISE PETITIONER OF HIS CONSTITUTIONAL RIGHTS.*

The record is clear that none of the interrogating officers advised the petitioner of his right to remain silent, that anything he said could be used against him, or that he was entitled to have counsel present to represent him. Nor did the district attorney, who eventually took petitioner's incriminating statement, offer these warnings.[11] There is conflicting testimony on the issue of whether or not petitioner requested to have an attorney present. Petitioner testified that he had made at least six requests to speak with an attorney. Some of the police officers who testified stated that petitioner had made no request for counsel. Others testified that they had no memory that such a request had been made. Still others testified that petitioner might have asked for a lawyer. (H.H. at 75). The police officers did testify that even if the petitioner had requested counsel, his request would have been ignored. The holdings in *Miranda* and *Escobedo* were not directly applicable to petitioner's interrogation. However, the lack of *Miranda*-type warnings is "a significant factor in considering the voluntariness of statements." *Davis v. North Carolina, supra*, 384 U.S. at 740, 86 S.Ct. at 1764. *See also United States ex rel. Burns v. LaVallee*, 436 F.2d 1352 (2d Cir. 1970), *cert. denied*, 402 U.S. 1012, 91 S.Ct. 2190, 29 L.Ed.2d 436 (1971); *United States ex rel. Delle Rose v. LaVallee*, 342 F.Supp. 567, 574, n.10 (S.D.N.Y. 1972). The failure of the police interrogators and the district attorney to advise petitioner of his constitutional rights is certainly a factor which weighs in his favor. In addition, if petitioner had had the benefit of the presence or advice of counsel, he would certainly have been furnished with the information that was essential to insure the intelligent exercise of his constitutional rights. *See United States ex rel. Castro v. LaVallee*, 282 F.Supp. 718, 726 (S.D.N.Y. 1968).

11. The district attorney testified that he did not advise petitioner prior to taking the statement that petitioner had already been booked for the crime of first degree murder. In fact, the district attorney testified that police officers had told him at that time that petitioner had not yet been booked and charged. (T.T. at 751). The district attorney knew that petitioner was the subject of a murder investigation but he did not at any time advise petitioner of what he was being accused. (H.H. at 315). The district attorney also testified that he had not advised petitioner of his constitutional rights prior to taking the statement. (T.T. at 751; H.H. at 312). He indicated that he was aware that petitioner had not yet been arraigned prior to the time that petitioner appeared in his office. (T.T. at 752–753). According to the district attorney, everything said to petitioner by him or by anyone else present was recorded by the stenographer in petitioner's statement which was read into the record at pp. 762–781 of the trial transcript.

(8) *PROMISES OF BENEFIT.*

Petitioner alleges that police interrogators implied that he would benefit by cooperating with them. He urges that, in fact, the police had no intention of aiding him, but merely sought to extract a confession from him. *See Lynumn v. Illinois,* 372 U.S. 528, 531, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

Detective Joseph T. McCarthy, to whom petitioner initially confessed, stated at the Huntley Hearing that he and two other police officers were questioning petitioner at approximately 7:00 a. m. on April 22, 1959, when he asked the other two officers to leave the room:

> They stepped out of the room. We started talking about the benefits of talking at the time. "You protect yourself. Don't let them put a rope around your neck." After a while he said that it was a deal, and then he went on to explain approximately what happened.

(H.H. at 255). Detective McCarthy also testified that he had advised petitioner that "if he told the truth and told us the facts that he would probably receive the benefits of any leniency that may come to him in the courts." (H.H. at 274). McCarthy testified that he had informed the petitioner that he would be helping himself by making a statement and that he would otherwise benefit by talking. McCarthy also stated that he had overheard Detectives Harmon and Angelo tell petitioner that "if he talked to them and told them what happened, that they would be able to help him and he could also help himself." (H.H. at 269). Detective Angelo testified to the same effect. (H.H. at 234–35).

■ I agree with Judge Latona's analysis of the record:

> Although the police promise of assistance to the defendant is not explicit the entire tone of the interrogation lends itself to the irresistible conclusion that implied help was a compelling motivation which induced the defendant to confess.

Memorandum decision of December 29, 1967, at 8 [hereinafter referred to as Latona Memo].

Courts have often suppressed damaging admissions made in a "bargaining atmosphere." *See, e. g., Crawford v. United States,* 219 F.2d 207 (5th Cir. 1955). The Supreme Court has condemned the use of confessions "obtained by any direct or implied promises, however slight." *Mallory v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). The Second Circuit Court of Appeals has required suppression of confessions where the police had promised to allow the accused to see his mother and a chaplain if he confessed [*United States ex rel. Williams v. Fay,* 323 F.2d 65 (2d Cir. 1963)], and where a confession was induced by false police promises of assistance on a charge far less serious than the police knew would actually be brought against the accused. *United States ex rel. Everett v. Murphy,* 329 F.2d 68 (2d Cir.), *cert. denied,* 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964). *See also Grades v. Boles,* 398 F.2d 409 (4th Cir. 1968) (confession suppressed where accused was told that he would be tried for only one felony and that his past record of convictions would not be pressed against him when in fact the prosecutor had no intention of following through on these promises); *United States ex rel. Caserino v. Denno,* 259 F.Supp. 784 (S.D.N.Y.1966) (confession suppressed where accused was told in good faith, but without foundation, by a police officer that he would only be used as a witness, that charges would not be brought against him and that anything he said would not be used against him).

The assurances by police interrogators that they would help petitioner and that he could help himself by confessing were clearly misleading. By acknowledging that he had participated in the robbery, petitioner was attempting to clear himself of the seemingly more serious accusation that he had been the "trigger man" in the shooting. However, rather than benefiting petitioner, this admission implicated petitioner in a felony murder and thus "put a rope around his neck," a result which police had clearly promised would be avoided if petitioner cooperated by telling his version of the incident.

The interrogators' purpose was to extract incriminating admissions from petitioner. They had neither the intention nor the authority to aid petitioner should he cooperate with them and acknowledge his role. The close proximity of police promises of benefit to the confession supports the conclusion that these "promises" were an important factor which compelled petitioner to confess.

## (9) *POLICE FRAUD AND DECEIT.*

At the time of the *Huntley* Hearing, petitioner's counsel learned that on the morning of April 22, 1959, while petitioner was in police custody, the interrogating officers had concocted a spurious confession which was supposed to have been made by one of petitioner's alleged accomplices, Ernest Jackson, and which implicated petitioner as the trigger-man in the Duscher robbery and slaying. Petitioner urges that police use of this spurious confession undermined his ability to freely determine the risks and benefits of cooperating with the authorities. *See Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

The Second Circuit Court of Appeals has recognized that "a mere deception by an interrogator, *ipso facto,* does not invalidate a confession absent other compelling circumstances." *United States ex rel. Lathan v. Deegan,* 450 F.2d 181, 185 (2d Cir. 1971), *cert. denied,* 405 U.S. 1071, 92 S.Ct. 1520, 31 L.Ed.2d 803 (1972). *See also. United States ex rel. Caminito v. Murphy,* 222 F.2d 698 (2d Cir.), *cert. denied,* 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955); *United States ex rel. Kern v. Maroney,* 275 F.Supp. 435 (W.D.Pa.1967). However, this police deception is a factor which should be considered in evaluating whether or not the confession was voluntarily made. *See Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Lisenba v. California,* 314 U.S. 219, 237, 62 S.Ct. 280, 86 L.Ed. 166 (1941); *United States ex rel. Everett v. Murphy, supra; United States ex rel. Caserino v. Denno, supra,* at 788.

Where deception, fraud, collusion or trickery and other coercion have been combined, a confession may be suppressed as violative of due process of law. *See Spano v. New York, supra; Leyra v. Denno, supra; United States ex rel. Everett v. Murphy, supra.* Courts which have found deception or trickery to be a significant factor have focused on the combination of unfulfilled promises of assistance or benefit which were reinforced by the deception or upon other coercive factors which were accompanied by police deception and fraud. *See, e. g., Spano v. New York, supra; United States ex rel. Everett v. Murphy, supra,* at 70; *United States ex rel. Caminito v. Murphy, supra,* at 699–701.

In this instance the deception practiced by the police was three-fold. First, Detective Harmon told petitioner that Ernest Jackson had accused him of pulling the trigger. (H.H. at 164–5). Second, the interrogators then foisted the spurious confession on petitioner in an obvious effort to trick him into implicating himself and others in the Duscher robbery and slaying. This police practice is to be soundly condemned. Such deception clearly has no place in our system of justice. Third, the police assured petitioner that the only way he could avoid having a rope put around his neck was by acknowledging his role and clearing himself of the charge that he had been the trigger man. As Judge Latona found, petitioner was not told that he could subject himself to a murder charge even though he was not the trigger man. [Latona Memo at 6]. Police knew that, by clearing himself of the claim that he had fired the fatal shots, petitioner would not be helping himself at all. On the contrary, he would thus unwittingly be implicating himself in the equally serious charge of felony murder. While the fact that the interrogators lied to petitioner in order to elicit his confession does not in itself render it involuntary as a matter of law [*see United States ex rel. Galloway v. Fogg,* 403 F.Supp. 248 (S.D.N.Y.1975); *United States ex rel. Brandon v. LaVallee,* 391 F.Supp. 1150 (S.D.N.Y.1974)], the deception practiced in this case is an important factor that weighs in petitioner's favor. Petitioner's

agreement to confess followed soon after the promises of benefit, the police deceit and the phony confession, underscoring their effect on his will. *United States ex rel. Lewis v. Henderson, supra,* 520 F.2d at 901.

Additional police activities further taint the interrogators' use of a phony confession by an alleged accomplice to elicit incriminating admissions from petitioner. Ernest Jackson had been arrested on April 21, 1959, in connection with the Duscher investigation. Lacking sufficient evidence to implicate Jackson in the Duscher murder, police had Jackson arraigned on a trumped-up vagrancy charge, questioned him and placed him in a cell for the night. During the course of a conversation between Jackson and an acquaintance named Bradley in an adjoining cell, Jackson made incriminating statements about the robbery and homicide. Unknown to Jackson, Bradley was acting as a police informant at the time and his admissions were subsequently introduced as evidence against him at his second trial. The New York State Court of Appeals ultimately ruled that Jackson's statements to the informant were inadmissible at trial. The court concluded:

> Where, as here, the arraignment on a vagrancy charge is merely a sham [*People v. Davis,* 13 N.Y.2d 690, 241 N.Y.S.2d 172, 191 N.E.2d 674 (1963)] the admissions are excluded because they were made during a period when the detention was merely a pretext for holding the defendant in connection with the investigation of the homicide.

*People v. Robinson,* 13 N.Y.2d 296, 301, 246 N.Y.S.2d 623, 625, 196 N.E.2d 261, 262 (1963).

Detective Kevin Harmon, who was one of the officers who concocted the phony confession, testified at the *Huntley* Hearing that he was familiar with the Jackson investigation and that he was aware of the informant's activities in the cellblock with Jackson on the evening of April 21 and

early morning of April 22, 1959. (H.H. at 403–421). It is fair to infer that the police relied on the fruits of their illegal activities practiced on Jackson in order to gain information that implicated petitioner in the Duscher murder.[12] The interrogators then exploited this initial illegality when they forged Jackson's name on the phony confession that was instrumental in gaining incriminating statements from petitioner. While such practices alone do not in this instance require suppression of petitioner's admissions (*cf. Wong Sun v. United States, supra*), it is clear that the police piled deception (the phony confession) upon illegality (Jackson's illegally obtained statements) in a successful effort to trick and trap petitioner. Such activity is another important element in the inherently coercive atmosphere that was created by police investigators and that was an important factor which eventually compelled petitioner's confession.

After reviewing the entire record, I must conclude that, under the totality of the circumstances surrounding his interrogation, petitioner's incriminating statements were coerced. No single factor tilts the scale in petitioner's favor. Rather, numerous coercive influences, evaluated for their cumulative impact on petitioner's will, lead me to conclude that petitioner's capacity for self-determination was critically impaired and that compulsion propelled the confessions: community atmosphere, as reflected by the public outcry and criticism of the police in the press, which formed the backdrop for the investigation; the dragnet investigative tactics in which upwards of 100 police officers participated and in which 25 to 30 black men, most of whom were innocent, were picked up, questioned and released; the lack of any showing that police had reliable evidence to support the arrest of petitioner on not one but two occasions; the midnight arrest in a tavern, the isolation of petitioner at police headquarters and the all-night interrogation by

---

**12.** Police had also linked petitioner to Jackson by a gasoline coupon, with Jackson's address scrawled on it, taken from petitioner's wallet. The contents of petitioner's wallet came to the attention of the police while petitioner was in custody pursuant to an arrest for which there has been no showing of probable cause and after petitioner had been booked for murder.

relays of police officers; the fact that police lied to, misled and ultimately intentionally deceived petitioner through use of a phony confession; the general promises of benefit made by police officers who had neither the intention nor the authority to fulfill the promises; the failure of any police officers, and especially the failure of the district attorney, to inform petitioner at any time of the charges to which he was about to subject himself or to advise him of his constitutional rights. Petitioner's confessions, induced by a wide range of coercive factors, including false promises of assistance which were reinforced by deceptions practiced by law enforcement officers, cannot be considered to have been given voluntarily. *United States ex rel. Everett v. Murphy, supra; United States ex rel. Caminito v. Murphy, supra.*

■ This ruling requires that petitioner's initial statement given to police officers shortly after 7:00 a. m. on April 22, 1959 must be suppressed. Because there was no break in the causative chain following this initial improper acquisition of the confession, the transcribed statement which petitioner thereafter gave to the district attorney and his subsequent identification of the vehicle used in the course of the robbery and murder must also be suppressed. *See, e. g. Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *Gilpin v. United States,* 415 F.2d 638 (5th Cir. 1969); *Killough v. United States,* 114 U.S.App.D.C. 305, 315 F.2d 241 (1962).

■ My review of the evidence, as recounted in note 5 above, indicates that, without these incriminating statements, there was insufficient independent evidence for the jury to find beyond a reasonable doubt that petitioner was guilty of the crime charged. At any rate, the use of the coerced confession in petitioner's criminal trial necessitates reversal, regardless of how much other evidence of guilt remains. *See, e. g., Malinski v. New York,* 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1039 (1945); *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); *Haynes v. Washington, supra. Cf. Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Petitioner has presented an additional claim which merits discussion. He alleges that he was denied his sixth amendment rights to confront witnesses and to a fair trial when the prosecutor abused two witnesses' privilege against self-incrimination. Petitioner argues that the prosecutor knew, even before he called them to the witness stand, that petitioner's codefendants, Ernest Jackson and Alphonso Williams, who were incarcerated but who were not then being tried jointly with the petitioner, would invoke their privilege against self-incrimination. Once these two witnesses had invoked the privilege, petitioner was then unable to cross-examine them. Petitioner concludes that, by calling these two alleged accomplices, the prosecutor was consciously attempting to add critical weight to the People's case based on inferences the jury would naturally draw from these witnesses' refusals to answer the prosecutor's questions.

It is established on the trial record that the prosecutor knew before calling these two witnesses to testify that they intended to invoke their fifth amendment privilege against self-incrimination. *See* Trial Transcript at 462–466 and 576–581. The questions that the district attorney asked these witnesses were obviously directed at linking them to the petitioner on the day that the robbery and murder were committed.[13] On

---

13. The relevant exchanges between the district attorney and Ernest Jackson follow:

Q. (district attorney): Mr. Jackson, do you know this man here, Willie James Robinson?

A. (Ernest Jackson): I refuse to testify. It might incriminate me.

The Court: You refuse to testify on the grounds that your answer would tend to incriminate you. You avail yourself of your rights under the Fifth Amendment, is that right?

The Witness: I refuse to testify. It might incriminate me.

By Mr. Diggins [district attorney]:

Q. Mr. Jackson, I show you People's Exhibits 28 and 29 for identification, an Oldsmobile car, with the license number 4896–BU, and I ask you if that is your car and was your car, in the year 1959?

A. I refuse to testify. It might incriminate me.

Q. I show you People's Exhibit No. 32 in evidence, a bag, with the initials BT on it, and I

the witness stand, neither Jackson nor Williams answered any significant questions. Both persistently refused to answer on the grounds that they might tend to incriminate themselves. At the time that the prosecutor attempted to elicit answers, the trial judge did instruct the jury to disregard certain questions that were asked by the prosecutor as well as the witnesses' refusals to answer those questions. Neither during the testimony nor in his final charge to the jury did the judge give the general instruction that these witnesses' refusals to testify could not be taken as evidence against petitioner. There was no request by petitioner's counsel to so charge the jury. However, petitioner's trial attorney did object to the district attorney's efforts to examine these witnesses and he did move for a mistrial following Jackson's appearance on the witness stand.

It is clear from the record that the jury realized that these two witnesses had once been petitioner's codefendants. The names of these witnesses were linked to petitioner throughout the trial, in the prosecutor's summation and in the court's instruction to the jury. The jury knew that Jackson and Williams had been indicted for the same crime that petitioner was charged with and

the jury also knew that these men were incarcerated at the time they refused to testify. The natural inclination of a juror hearing one of the alleged accomplices refusing to indicate whether or not he had been with the petitioner at the time the crime was committed, because such an answer might tend to incriminate the testifying witness, would be to conclude that these men had been involved together in the commission of the crime charged.

Since Alphonso Williams had already been convicted for the crime in question, and had no appeal pending, he could no longer claim the fifth amendment privilege and could have been compelled to testify. *See Reina v. United States,* 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960); *United States v. Romero,* 249 F.2d 371, 375 (2d Cir. 1957). However, since the district attorney was aware of Williams' intention not to testify, any prejudice to petitioner could have been avoided if this matter had been resolved outside of the jury's presence and before Williams took the witness stand.

Ernest Jackson did not stand convicted of the crime at the time that he was called to testify. Prior to the time Jackson took the witness stand, the district attorney had inti-

ask you if that was your bag back in 1959? Did you have that in your possession?
A. I refuse to testify. It might incriminate me.
Q. Did you work at one time at Tunmore Motors?
Mr. Boreanaz: Excuse me, your Honor—
The Witness: I refuse to testify. It might incriminate me.

\* \* \* \* \* \*

Q. Did you know a man by the name of Alphonso Williams back in April of 1959?
A. I refuse to testify. It might incriminate me.

\* \* \* \* \* \*

Q. I show you People's Exhibit No. 2 in evidence, Mr. Jackson, a photograph of a store known as Henry's Food Market, and I ask you if on the 18th day of April of 1959, you drove this defendant, Willie James Robinson, and Alphonso Williams to that address sometime around 9:30 that evening?
A. I refuse to testify. It might incriminate me.

Trial Transcript at 463, 464.

The relevant questions directed to Alphonso Williams and his responses follow:
Q. (district attorney): Did you see Willie James Robinson on the 18th day of April, 1959?
A. (Alphonso Williams): I refuse to answer on the ground it may incriminate me.

\* \* \* \* \*

Q. I show you People's Exhibits 28 and 29, a photograph of a two-tone automobile of an Oldsmobile make. Do you recognize that automobile?
A. I refuse to answer on the grounds it may incriminate me.
Q. Did you and this defendant, Willie James Robinson, and Ernest Jackson, on the 18th day of April of 1959, go to a store at the corner of Delaware Avenue and Sanders Road some time in the evening, a store conducted by Henry Duscher? Did you go there?
A. I refuse to answer on the grounds it may incriminate me.
Q. And you told me that prior to the time—you told me that you weren't going to testify prior to the time that you took the stand, isn't that true?
A. I refuse to answer on the grounds it may incriminate me.
Q. You refuse to answer that question?
A. On the grounds it may incriminate me.

Trial Transcript at 580.

mated to the trial judge that Jackson would refuse to testify. However, the court still allowed questions to be propounded to Jackson, questions which required Jackson to respond by asserting his fifth amendment privilege against self-incrimination.

 Under the rules established in *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), and *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), the practice of compelling a witness to invoke his fifth amendment privilege can require reversal in two situations: (1) when the prosecutor consciously attempts to influence the jury by building his case out of inferences arising from use of the testimonial privilege, thus depriving a defendant of due process of law; or (2) when inferences from a witness's refusal to answer add critical weight to the prosecutor's case in a manner that does not allow the defendant to subject the witness to cross-examination and thus unfairly prejudices the defendant by precluding him from exercising his sixth amendment right to confrontation.

 Under either test I believe that it was improper for the district attorney to call Jackson and Williams as witnesses since he knew beforehand that each intended to invoke his fifth amendment privilege. This knowledge and the nature of the questions the prosecutor asked demonstrate that he was intentionally trying to influence the jury by creating impermissible inferences. Without petitioner's confession, the People's case rested on circumstantial evidence, none of which clearly placed petitioner at the scene when Henry Duscher was robbed and shot. The inferences that would naturally be drawn by the jury from these witnesses' refusal to answer the prosecutor's questions may well have added critical weight to the People's case. If there had been any reason to believe that the defense intended to argue to the jury that the prosecutor's failure to call these witnesses showed that they were unable to offer testimony implicating petitioner in the crime [*see, e. g., United States v. Gernie*, 252 F.2d 664, 669 (2d Cir.), *cert. denied*, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958)], this issue could have

been resolved outside the jury's presence so as not to prejudice the case for either side.

I need not decide whether this constitutional attack on the conviction would alone be sufficient to support issuance of the writ. It is enough to recognize that these actions by the prosecutor added to the unfairness of a proceeding which I have already found to be constitutionally deficient in other respects. *See Moynahan v. Manson*, 419 F.Supp. 1139, 1147–1150 (D.Conn. 1976), *aff'd* 559 F.2d 1204 (2d Cir. 1977).

 Petitioner's final claim is that he was deprived of due process of law when the court failed to instruct the jury that it should not consider the truth or falsity of the confession in determining the issue of voluntariness. *See Rogers v. Richmond*, 365 U.S. 534, 543–544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Petitioner's trial was held before the Supreme Court's decision in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), which requires the trial court to make an independent determination of voluntariness. Petitioner argues that the jury verdict was less reliable because of the nature of the jury instruction. However, since the Appellate Division remanded the matter for a full *Huntley* Hearing in light of *Jackson v. Denno, supra*, and *People v. Huntley, supra*, and then made its own determination on the law and the facts, I believe this claim is without merit. Any error which might have been made in the jury instruction was, in retrospect, harmless since the courts made a subsequent, independent determination of voluntariness. Jury instructions are normally matters of state law. There is no indication in the record that the jury instruction otherwise tended to deprive petitioner of due process of law. *Cf. United States ex rel. Smith v. Montanye*, 505 F.2d 1355, 1359 (2d Cir. 1974), *cert. denied*, 423 U.S. 856, 96 S.Ct. 106, 46 L.Ed.2d 81 (1975).

For the reasons discussed above, the application for a writ of habeas corpus is granted and the judgment of conviction is vacated. Petitioner shall be released from the custody of the New York State Department of Correctional Services unless, within

sixty days of this order, further proceedings on the original indictment are initiated.

Petitioner's counsel is to be commended for the excellent quality of representation provided petitioner throughout this proceeding.

So ordered.